We have four cases on the calendar this morning, three patent cases, two from the PTAB, one from a district court, and a case from the Court of Federal Claims on military pay. Our first case is Valiant Pharmaceuticals, Salix, Wyeth v. Mylan and Aktavas, 2018-2097. Mr. Florence. Good morning, Your Honors. May it please the Court. My name is Robert Florence, and I'll be arguing on behalf of the appellant, Mylan, today. We're here today because the district court committed multiple legal errors in finding that there was no triable issue of material fact with respect to Claim 8 of the 025 patent. Claim 8 is a simple claim. It's straightforward. It requires a solution of methanoltrexone or a salt thereof, a pH of between about 3 and about 4, and having 24 months stability at about room temperature. Because simply claiming the pH and the stability of a known compound should not be a viable invention, the claim is ripe for a robust and validity-challenged trial. However, the district court cut Mylan off at the knees by taking an unduly myopic view of the evidence and this court's precedent, resulting in multiple legal errors. First and foremost, the district court substantially changed the claim to support its conclusion with respect to the 24th stability limitation. Despite there being no requirement that stability must be achieved by pH alone or without any addition of stabilizers, the district court decided that, in fact, it did, making no less than 14 statements in the opinion to that effect. Your view from what I gather from the briefs is that you think that Pryorart showed a prima facie case of obviousness of Claim 8, right? That's correct, Your Honor. And that, therefore, summary judgment, but summary judgment should not have been granted. If we agree with you that there was a prima facie case, what are the fact questions that should be dealt with on remand? Sure. Well, first and foremost, the case should be remanded to apply the proper claim construction because the district court never analyzed the Pryorart through the lens of the proper construction. The district court required the Pryorart to show stability by pH alone, where the claim just doesn't require that. So that's the first issue. And then, secondly, there's a tribal issue of fact as to what the structurally and functionally similar compounds of naloxone and naltrexone show in the Pryorart in solutions having pHs that overlap with the claimed range here and whether or not those references teach that the stability limitation can be obtained. That's the second. And then, third, there's a tribal issue of fact on Milan's obviousness theories, which were never analyzed through the proper claim construction. And on the obvious to try theory, which the court did analyze, the court applied the law to narrowly requiring Milan to demonstrate that the pH was the first and foremost method that a POSA would use to improve stability. And not only is that not required by the claim, it's not required by the law because the law requires only there to be finite and known solutions to the problem. pH adjustment does not have to be the first and foremost solution. So those are the three main. Please proceed. Thank you. Next, the district court failed to heed this court's precedent by choosing to discount Milan's Pryorart references disclosing naltrexone and naloxone, which are closely related and structurally similar to methanoltrexone, as I said, in compositions having pHs overlapping the claimed range. This court has consistently found such structurally and similar compounds to be highly relevant to the obviousness analysis, but the district court here brushed them aside as merely peripheral. Finally, if time permits, after setting up its unsupportable claim construction, I'd like to point out that the district court zeroed in on Milan's obvious to try theory and while applying its unsupportable claim construction and in misapplying the law, the On that particular point, turning now back to the claim, there's nothing in the claim language or the patent, in fact, that links the pH range to the 24-month duration of stability. The claim expressly uses the open-ended transitional phrase comprising, and there's no language or limitations in the claim that ban the presence of other stabilizers in the pharmaceutical preparation. Notably absent from the claim are any limiting phrases such as pH alone or without added stabilizers, all phrases that the district court read into the claim. But perhaps most importantly, there's nothing in the patent that teaches that stability for the full 24-month duration can even be achieved by pH alone. There is stability data in the 025 patent, but it's for 12 months. There's no stability data for 24 months. Rather, the patent repeatedly encourages... No, one doesn't need proof in a specification to make a claim. Of course, if the claim is inoperative, that's another matter, but that's not an issue here. That's correct, Your Honor, and that's not the point that we're making. The point we're making here is that the patent itself has to be looked at. The court needed to look at the specification as a POSA would to determine the scope of the claim that's at issue, and the patent itself teaches that in order to obtain the longest duration of stability, there should be a combination of using pH optimization also along with stabilizers, and in fact, every working example does that very thing. So there's nothing in the claim that would exclude a skilled artisan from adding stabilizers to achieve the 24-month duration of stability, and the district court clearly erred in finding otherwise as evidenced by all the statements that it made while discounting the prior art through the lens of its erroneous construction. Well, claim 8 simply recites a result without having anything in the claim that creates that result, so that result, if the claim is operative, must have come about from claim 1 that it depends from. That's correct, but there's nothing in claim 1 either that excludes the use of stabilizers. It does state that it has a particular pH, but it's not linked to the claim stability, and the district court's error is evident in how it treated the prior art as it looked at the prior art. Some of the statements the district court made regarding the Bayhall reference, the district court declared that the reference does not get the defendants to where they need to go, which is that methyl naltrexone can be formulated as a solution with 24-month stability with a pH of 3 to 4 without the use of any added stabilizers. Similarly, regarding the Auschleck reference, the district court declared that that reference does not at any point disclose the use of pH alone to stabilize naltrexone solutions. There are many other statements, but the district court's error can be summarized in the statement where it ultimately concluded that there was no evidence overall that a skilled artisan would have predicted or anticipated success of a formulation using only a pH of 3 to 4 to stabilize such a solution. Yet Mylan was not required to demonstrate that the court's erroneous claim pH-only construction was obvious. Mylan's only required to demonstrate that the properly construed claim is obvious, and it's Mylan's position that the district court construed the claim incorrectly. Next, based largely on its erroneous construction, the district court further erred by dismissing as merely peripheral the prior art disclosure of highly similar related compounds with overlapping pH ranges. This court has long held and in fact recently reaffirmed in the Anacor case that a skilled artisan looking to improve a known compound like methanoltrexone here will be highly motivated to study similar compounds with common properties because it's reasonable to assume that they would share other related properties as well. And in the Anacor case, looking at its earlier law and precedent, this court reiterated that may be sufficient to give rise to an expectation that compounds similar in structure will also have similar properties. And the property we're talking about here is stability. The evidence of record comports perfectly with this court's precedent on this point. There's ample evidence that methanoltrexone does indeed have substantial structural similarity to both naloxone and naltrexone. All three compounds are opioid antagonists. They're all derivatives of oxymorphone. As a result, their structures share a common structural foundation with the only difference being a single substituent on the nitrogen or the amine group. Myland's expert chemist, Dr. Hunter, opined... Counselor, at that point in the composition, are we talking about a finite number of differences? Between these three molecules, correct. There's only one substituent that differs. Not finite, infinite. Is there an infinite amount of differences? No, there's not. If two compositions are not the same and you're saying that they're similar, is there an infinite number of similar compositions that we're dealing with? No, no. Here, we're only dealing with the two pre-existing naloxone and naltrexone, oxymorphone derivatives and naltrexone. The trial court did say there was an infinite number of pH ranges. That can't have been correct. You're talking about two significant figures, one after the decimal point, which means that there were 10 possibilities between 3 and 4, and even with two figures after the decimal point, 100, so that infinity comment, surely a finding or whatever it was, was incorrect. I absolutely agree with that, Your Honor. I thought you would. I don't know how the district court could have arrived at that conclusion, and if that was true, then every bounded range would always be infinite, and that's just clearly not the case here. And I'm not sure if I answered. No, you answered the question. Okay. Thank you, Your Honor. And so, Mylan's expert chemist, Dr. Hunter, talking about this substantial structural similarity, he said that he testified and opined that Oposa would recognize that properties such as stability of the functional groups that make up these molecules that are the result of the common portions are likely to be shared. He further opined that under acidic conditions, the pH of the claim here, the similarities between these three molecules actually increase because it has the effect of protonating the substituent, which is a tertiary amine on the naltrexone and the naloxone, making it even more closely similar to the substituent that's on the methyl naltrexone, which is a quaternary amine. And he opined that because of these additional similarities when in solution at acidic pH, Oposa would have an even greater expectation that the property of stability would indeed be similar. Mylan's formulator expert, Dr. Kahn, similarly opined that when developing any formulation, Oposa would generally consider what was known and reported for similar compounds in the and would consider the pH that was found to be suitable for these, such as in naltrexone and naloxone, as evidenced by the Oschlack and the Bayhall references that are in the record. And Dr. Kahn cited to the well-known treatises Gibson and Remington. Counsel, you're into your bottle time. You can continue or save it as you wish. I will save it. I'll have it. All right. Thank you. Mr. Diner, is it? Diner, just like the rest of the room. Diner, right. Good morning, Your Honors. Brian Diner for plaintiffs. May it please the court, the judgment below should be affirmed at least because there is a failure of proof on the reasonable expectation of attaining 24-month stability with no more than 2% degradation. But look, counsel, we've got a complex molecule here, tricyclic complex nitrogen bridge. These compounds are in the prior art. There's nothing novel about the compound. And what we're talking about is one of these compounds being stable with a pH of 3 to 5. 4. 3 to 4. Well, these pH ranges are in the prior art for compounds of this nature. Why isn't it clear there was a premutation case and summary judgment was wrongly granted? Well, because, Your Honor, it is undisputed on this record that there is no formulation in the prior art on this record that achieved 24-month stability with no more than 2% degradation. And even with, if you assume the pH of 3.2. Well, those are results. This is a composition. It's a composition claim, a claim consisting of a stable pharmaceutical preparation comprising methyl naltrexone at a pH of 3 to 4. That's all there is to a compound in a solution with a certain pH. Well, it also requires and recites that there be a 24-month stability for that composition at no more than 2% degradation. And for a composition of matter as well established in this court's law. But that's a result. What is there in the claim that brings that about other than the nature of the composition? The compound. Well, Your Honor, a composition of matter and its properties are inseparable as this But in addition to that, it is very clear that on this record, just having a pH of 3 to 4 will not give you necessarily and inevitably a stability of 24 months with no more than 2% degradation. You mean the claim is inoperative? Absolutely not, Your Honor. The 025 patent specification is enabling for the claim as written. It says at column 11, lines 38 to 45, that a stability of 24 months and no more than 2% degradation can be attained. It gives actual test results at column 8, lines 47 to 58. It provides a number of teachings and guidance with respect to appropriate buffer systems to get you there. But importantly, just having a pH of 3 to 4, Your Honors, is not necessarily and inevitably going to get you to the claim stability. Now, they didn't argue inherency. It's not in their opening brief. It's waived. It wasn't developed below. But if you look at the patent specification, it actually makes clear why this is a so and it dispels the notion that just having a pH of 3 to 4 will give you the claim stability. At column 10, lines 27 to 33 of the patent in suit, it says that when you add base to this formulation, it depends on how you get there, Your Honor. Just getting to 3 to 4 doesn't do it. It teaches you how to get there in a way that will give you stability and avoid destabilizing the compound. At column 10, lines 27 to 33, it says adding base will destabilize the compound, such as sodium hydroxide. And Dr. Kahn, Mylan's expert. Adding base raises the pH. But if you bring it down, for example, in making the formulations, it goes to how it's formulated to say by adding excess acid to say 2 or 1, then you've got to titrate it up with base. You add sodium hydroxide to it, and it's going to exasperate the degradation, and it's going to destabilize. Point in fact, it doesn't establish on this record that just having a pH of 3 to 4 will get you the claim stability. And our own specification establishes it enables our invention because it describes our invention and it provides information to do so. But it also establishes that 3 to 4 does not necessarily inevitably get you to the claim stability. What causes the stability if it's not the compound's inherent properties and the particular pH? There's nothing else in the claim. What the patent is teaching and what one skilled New Yorker would know when they read that claim in light of the patent specification is that a pH of 3 to 4, yes, it can get you alone the claim stability. But it also teaches and provides guidance that one skilled New Yorker reading the specification would know that the way you formulate it is also important, and it provides information and guidance to do that. As I said, for example, at Column 9, most of that column, it gives you information, the skilled person information on the buffer systems that would be appropriate to get the claimed stability of less than 2% or not more than 2% degradation at 24 months. And it also teaches you what to avoid so that you don't have a situation where you just arrive at 3 to 4, but you have degradation that exceeds 2%. I'd like to go to Milan's failure proof with respect to that claim limitation, which is a recited limitation and a property of this composition. The motion was brought to test their evidence, and on this critical limitation, on this record, they failed to establish a reasonable likelihood of success of being able to meet the claim limitation of 2%, no more than 2% degradation. Their expert's testimony is insufficient on this, both in terms of the expert reports and that the deposition of Dr. Kahn fares no better. During his deposition, he made a number of conclusory unsupported statements to try to argue that accelerated studies, for example, will get you to the claimed pH of 24 months. But he never mentions, in fact, in that testimony anything about 2% degradation. What about Dr. Hunter? What did his evidence point to? His evidence pointed to the fact that Dr. Kahn's unsupported conclusory statements were not enough, and you actually needed more information, because Dr. Hunter said that with respect to Oshlock, one of the references directed to naltrexone, the alleged structurally similar compounds, that none of those examples met the claimed stability limitation. And importantly, at 18 months, which is real-time stability, it already had exceeded 2% degradation. And so Dr. Hunter's testimony actually makes clear that Dr. Kahn's testimony needed to have more support than just his word that six weeks at 60 degrees C or six months at 40 degrees C and 70% relative humidity automatically gets you to 24 months. If there was some industry practice or some view in the industry, then they should have provided evidence to support that, and they didn't, and that's the point. That's why they have a failure proof. That's why that testimony is conclusory, unsupported, and cannot raise a genuine issue of material fact in the context of summary judgment, and that is clear as a matter of law, both in terms of the biotech case and the in vitro gen case that we cited in our materials. Now, I'd like to turn to the allegation that the district court misconstrued claiming. It did not. But before I forget, the first point to make is even if the district court did misconstrue claiming and incorporate a pH-only stability requirement, as counsel says, it would not have mattered in this case because they still, for all the reasons I've mentioned, have a failure proof with respect to the 24-month stability limitation and no more than 2% degradation. But the district court, importantly, Your Honors, was not interpreting Claim 8 and certainly wasn't misinterpreting it or misconstruing it. He was merely responding to the arguments that they made below with respect to what their theory of obviousness was. In their introduction and often repeated throughout their brief below in their opposition, they say that the pH of 3 to 4 is the predictable solution to solve the alleged long-term stability problem. They say that in the intro. They say that at Joint Appendix 393, Paragraph Bridging 393 to 394, they say that at 4003 and 4012. Not surprisingly, Your Honors, the judge below was responding to their argument of obviousness, the postulated theory of obviousness, when he actually cited at Joint Appendix 31 and then in the Paragraph Bridging 34 to 35 and 38, he said, quoting them, arriving at a pH of 3 to 4 for stabilizing methyl naltrexone solutions was a predictable result. He carried that underlying factual premise, a proposition that they proposed throughout his discussions with respect to the references. And what we see, Your Honors, is that he was not saying pH alone. What he was saying is this is your theory of obviousness. There's nothing else in the claim other than pH. And pH from 3 to 4 is well described for naloxone compounds. So, clearly, there was a prima facie case of obviousness of this compound, which is an old compound, close to others, the claim reciting nothing other than pH. And in Claim 8, a further result in stability of what 20, a little longer term than was in the specification. Respectfully, Your Honor, we would disagree. In fact, when you look at the pH of 3 to 4 and you look at this record to follow up on your thought process there, when you look at this record, it is undisputed on this record with respect to creating a prima facie case that pH had no effect on the stability of these formulations. There's nothing else in the claim. There's nothing else in the claim. Claim 8 recites a result of 24 months stability. That's the result. There's nothing in Claim 8 that causes that stability. There's no compound there. There's no stabilizer. And Claim 8 is dependent on Claim 1, which is similarly devoid of anything to cause stability, other than either the pH, which is well known for similar compounds, or the nature of the compound itself. Well, the record evidence in this case, Your Honor, is established that there would not and could not have been a prima facie case of obvious just because pH was there for structurally similar compounds. Because the record establishes that those structurally similar compounds, when they isolated pH of pH 3.2 and measured its stability, it actually caused significant destabilization upwards of 20 to 29 percent. So on its face, it wouldn't have created a prima facie case. Not only that, the experts… The lack of stability for these that you're reciting? We have a different compound, Your Honor. And they have admitted that. We have a different compound, which has different activity. And that's the reason why it is different. And that's the reason why it performs differently. And we have a 24-month stability limitation with no more than 2 percent degradation that has never been attainable in the prior art before. And it's because of the differences in the compound. But as I was saying before, another reason why there couldn't have been a prima facie case on this record, in addition to the fact that when they isolated pH of 3.2, it actually destabilized, when you look at what Dr. Hunter said with respect to Oshlock, he already said that none of those examples had the claimed stability. And in 18 months of real time, actually showed more than 2 percent degradation. And so it's a prima facie case, if anything, of non-obviousness, Your Honor. Not of obviousness. And so as I was saying with respect to this allegation that the district court misconstrued the claim, it was just responding to their position of obviousness and looking for proof out of the record. He analyzed Formulations 1 and 3 of Bohal. And Formulation 1 is what I was referring to before. When they isolated pH and measured its stability, it caused substantial degradation. And when they put in a stabilizer, it somehow cured that degradation. But the point that you make here or you see here is that it didn't comport with their position of obviousness. Their postulated position that pH was going to be the predictable solution. And the judge was just saying, show me something in this record that supports your theory of obviousness. Finding none is why he concluded there was not a record upon which anyone can conclude that the underlying factual proposition of arriving at a pH of 3 to 4 for the long-term stability methyltrexone solutions was indeed not predictable based on that evidence. And if you look, Your Honors, at Joint Appendix page 40, you will see there at the bottom of that page, sorry, 39 into 40, you will see at the bottom of page 39 that he actually is looking at all the evidence as a whole. He dismisses their case on obviousness because they didn't prove what they said the prior art did prove. But then he looked at all the evidence as a whole and he said, optimize pH along with stabilizers and chelators and container systems can be experimented with. And there it itself establishes that he understood the claims to be broader, to be a comprising claim and not restricted. But then he said, it's just be like when you have all that together, it's just like throwing the metaphorical dots at a target and without any guidance or direction in their art. And that cannot lead to a kind of fictitious case of obviousness. Thank you, Your Honors. I believe I'm out of time. Thank you for your time today. Thank you, Counsel. Mr. Florence has some rebuttal time. Mr. Dinah says lack of proof, lack of evidence. Mylan respectfully disagrees. The district court clearly required the claim at issue to have a pH only limitation and then looked at the prior art through that lens. And once looking at the prior art, the district court declared that, well, there's nothing in the prior art that indicates that you could have the claimed duration of stability based on pH alone. But that's not what the claim requires. And what the prior and I believe what I heard Mr. Diner say more than once during his argument was that he admitted that having a pH of three to four alone will not get you the 24 month stability here that's claimed in the claim. Well, you can't discount the prior art for not being able to do that either based on pH alone when the claim doesn't cover it and they've admitted that they can't do it on pH alone. What the prior art does show is that in structurally similar compounds, naloxone and naltrexone, having a pH that overlaps with the claimed range and with the addition of stabilizers, you can get incredibly long durations of claim stability. It's correct that the prior art does not disclose 24 months specifically per se. However, it does disclose accelerated stability data. And Dr. Kahn explained and testified on that point that FDA proposes routinely extrapolate estimations of long term stability from such accelerated stability data. And that the FDA allows this and it's routine because when an applicant applies for a new drug application with the FDA, they don't have long term stability. There hasn't been enough time hasn't passed to generate that real time data. So the FDA allows and Dr. Kahn testified based on his own experience that it's allowable to put the drug under accelerated stability conditions, usually at 40 or to 60 degrees Celsius under a higher amount of humidity. And based on that data, APOSA can extrapolate to a longer time period and even here 24 months. And on this point, the district court gave credit to this argument. The district court said that viewing Bayhoff. Now, I'll keep in mind the district court was still viewing Bayhoff through the lens of its erroneous construction. But the district court remarked, if claimant taught that 24 months stability of methanol Trexan solutions could be accomplished through the use of sodium ettodate, in other words, not just pH, then myelin might have a good point. But the point here is the claim doesn't recover, doesn't require pH alone. And Bayhoff and the other references do indeed teach that through a combination of both pH optimization and the use of stabilizers, you can get longer durations of stability. So there was a reasonable expectation of success here. And my time is up. Thank you.